**ABADIR & COMPANY and Bush Y. Abadir, d/b/a Abadir & Company, Plaintiffs-Appellees, Cross-Appellants,**

v.

**FIRST MISSISSIPPI CORPORATION, Defendant-Appellant, Cross-Appellee.**

**No. 80–3403.**

United States Court of Appeals,
Fifth Circuit.
Unit A

July 24, 1981.
Rehearing and Rehearing En Banc
Denied Sept. 10, 1981.

Butler, Snow, O'Mara, Stevens & Cannada, Alan W. Perry, Lawrence J. Franck, Jackson, Miss., Robert H. Bork, New Haven, Conn., for defendant-appellant, cross-appellee.

Thomas, Price, Alston, Jones & Davis, Charles R. Davis, Kenneth A. Rutherford, Jackson, Miss., for plaintiffs-appellees, cross-appellants.

Before CHARLES CLARK and RANDALL, Circuit Judges, and SHARP,* District Judge.

SHARP, District Judge:

Defendant-appellant, First Mississippi Corporation (First Mississippi), appeals from a judgment that First Mississippi violated Section 1 of the Sherman Anti-Trust Act (15 U.S.C. § 1). The issues on appeal are (1) whether there was insufficient evidence for the jury to find that First Mississippi had entered into a market-distributing agreement with Plaintiffs-Appellees, Abadir & Company and Bush Y. Abadir (collectively referred to herein as "Abadir"), and (2) whether the District Court erred in applying the horizontal market-distribution *per se* antitrust test that market-distributing agreement between First Mississippi and Abadir.

In the Complaint, Abadir alleged (1) that First Mississippi had breached a contract to sell 15,000 tons of urea to Abadir, and (2) that First Mississippi had violated Section 1 of the Sherman Act by limiting the geographical area in which, or the customers to whom, Abadir could resell the urea. The case was tried before a jury. Answering written questions, the jury found that First Mississippi had breached its contract with Abadir by failing to deliver the urea. First Mississippi does not appeal that portion of the judgment relating to the contract claim.

The District Court ruled that if First Mississippi had imposed any market-distributing agreement on Abadir, then First Mississippi had committed a *per se* violation of the antitrust laws. The jury found that First Mississippi had imposed such a restriction and that Abadir and acquiesced therein. The issues involved in this appeal grow out of this determination that First Mississippi committed a *per se* violation of the antitrust laws.

# I

Abadir & Company is a corporation owned by Dr. Bush Y. Abadir. In 1972, Dr. Abadir commenced business as an independent trader, dealing in various commodities including chemicals, fertilizers, and industrial chemicals. A trader buys and sells products for its own account or acts as a broker on behalf of other companies buying and selling products needed by the client. Typically, a trader has no warehouse facilities, distributor or retail outlets, and does not purchase with the intent of taking physical possession of the product. Abadir had no manufacturing, storage, or transportation facilities for urea or any other fertilizer or chemicals.

First Mississippi is a publicly held corporation listed on the New York Stock Exchange. First Mississippi's primary business is the production and sale of fertilizer and chemicals, including urea. In 1973, the time of the transaction in question, First Mississippi's primary source of urea was Triad Chemicals, a joint venture of First Mississippi and Mississippi Chemical Corporation. Mississippi Chemical was a cooperative in which First Mississippi owned a minor interest. First Mississippi and Mississippi Chemical were each responsible for fifty percent of the costs of Triad's operation and were each entitled to withdraw fifty percent of Triad's production. As a stockholder of Mississippi Chemical, First Mississippi had rights to purchase some smaller quantities of urea from Mississippi Chemical. Thus, First Mississippi acquired slightly more than fifty percent of the urea produced by Triad.

Urea is an inorganic chemical compound containing approximately forty-five percent nitrogen, and is used worldwide for fertilizer and for various industrial purposes. Urea is manufactured to specifications, and is sufficiently homogeneous to be fungible in most applications. The estimated annual worldwide production capacity of urea in 1973 was 30 million tons. United States capacity was 4.5 million tons. First Mississippi's share of the Triad production was approximately 220,000 tons in 1973, approximately 0.74% of world production and 5% of United States production. In 1973, First

---

* District Judge of the Northern District of Indiana, sitting by designation.

Mississippi also purchased from Transnitro, another manufacturer, 48,000 tons of urea, which was delivered to First Mississippi at the rate of $4,000 tons per month. First Mississippi presented evidence showing that the reason for this purchase was to cover anticipated production shortages at the Triad plant. First Mississippi's only other transaction in urea was a 15,000 ton exchange with another urea supplier, an exchange, common in the urea market, made for mutual convenience in meeting delivery contracts.

At the relevant time, First Mississippi distributed its products primarily through its own employees. But First Mississippi also used brokers to reach certain customers and to develop new markets.

In March of 1973, First Mississippi agreed to sell Abadir 15,000 tons of urea at $75.00 per ton. First Mississippi's position in the court below was that Abadir had specifically represented to First Mississippi at the time of the agreement that the urea would be sold only to a principal in Asia, and that the representation was a material part of the contract. The jury found that the contract did not contain any provision requiring that Abadir resell only to such a purchaser. First Mississippi does not challenge the sufficiency of the evidence to support this finding of fact.

At about the same time that Abadir entered into the contract with First Mississippi, Abadir agreed to sell 10,000 tons of urea to Sumitomo Shoji America, Inc. Sumitomo agreed to sell the 10,000 tons of urea to International Commodities Export, Inc., which agreed to sell the urea to Cities Service Export, Inc. At the end of the chain, Cities Services agreed to sell the urea to Transamonia Export Corporation.

The jury found that at some point between the time First Mississippi agreed to sell the urea to Abadir and the time that the urea was to be delivered, First Mississippi imposed on Abadir, and Abadir acquiesced in, an agreement that Abadir could only resell the urea for consumption in Asia. First Mississippi learned from Transamonia that Abadir had resold the urea without that limitation. First Mississippi refused to deliver any of the 15,000 tons of urea. In August of 1973, First Mississippi sold 15,000 tons of urea directly to Transamonia. The parties stipulated that Abadir was damaged in the amount of $57,500.

## II

■ In order to recover damages for a violation of Section 1 of the Sherman Act, a plaintiff must prove (1) the existence of an agreement (2) which unreasonably restrains trade (3) to the damage of the plaintiff.

■ First Mississippi first challenges the sufficiency of the evidence to support the jury's determination that there was a market-dividing agreement between First Mississippi and Abadir. On re-direct and re-cross examination, Dr. Abadir insisted that he had acquiesced in First Mississippi's requirement that he only resell the urea for consumption in Asia. (See transcript of trial at pages 275 and 280–85) That testimony was sufficient for the jury to find that there was a market-dividing agreement between First Mississippi and Abadir.

## III

First Mississippi's primary argument is that any market-distributing agreement between First Mississippi and Abadir is vertical, in spite of First Mississippi's practice of distributing urea, in competition with its distributors, including traders like Abadir.

This issue is virtually controlled by *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001 (5th Cir. 1981).[1] In that case, Red Diamond had argued that a market-dividing agreement between Liquid Carbonic and Liquid Carbonic's distributors was a horizontal agreement because Liquid Carbonic also distributed some of its own goods. As Judge Gee wrote in that case:

1. While the law interpreted in *Red Diamond* was Louisiana state law, the Court expressly proceeded under the guidance of federal law.

*Red Diamond's* interpretation of Louisiana law applies equally to federal law.

Since the allegation here is that Liquid imposed an agreement upon its distributors to abide by territorial and customer restrictions, that agreement is a vertical one, and the restrictions imposed are vertical restrictions.

That Liquid also distributed some of its own goods does not alter the situation.· (Citations omitted.) When a producer elects to market its goods through distributors, the latter are not, in an economic sense, competitors of the producer even though the producer also markets some of its goods itself; rather, the distributors are "agents" of the producer, employed because the producer has determined that it can supply its goods to consumers more efficiently by using distributors than it can by marketing them entirely by itself. (Citation omitted.) While it is possible that a nominally vertical arrangement may in fact be a horizontal one in disguise, (Citations omitted.) such is not the case here.

637 F.2d at 1004–05.

As Judge Gee noted, this holding is supported by the Supreme Court's decision in *Continental T. V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). In *Sylvania*, the Supreme Court expressly reversed *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). In *Schwinn*, the Supreme Court held that vertical territorial agreements were *per se* antitrust violations. The Supreme Court expressly reversed *Schwinn* even though Schwinn could have been distinguished on the grounds that Arnold, Schwinn & Co. also competed with its distributors by selling some of its bicycles directly to retailers.[2]

**IV**

■ This case can be distinguished from *Red Diamond* because technically First Mississippi does not occupy the traditional manufacturer position in the chain of urea distribution. The district court found that First Mississippi was not a manufacturer. Just over eighty percent of the urea which First Mississippi sold in 1973 came from Triad Chemicals, the joint venture fifty percent owned by First Mississippi. Twenty percent of the urea which First Mississippi sold was purchased from another manufacturer, Transnitro.[3] Transnitro delivered that urea, as required by the contract, in equal monthly installments. The differences between this case and Red Diamond are insufficient to change the result. The market-dividing agreement between First Mississippi and Abadir was not horizontal, but vertical.

**A**

It has long been recognized that, read literally, Section 1 of the Sherman Act would prohibit all commercial contracts, since all entrepreneurs are potential competitors, and all contracts therefore restrain trade. But courts have adopted the "rule of reason" as the prevailing test for determining whether contracts or agreements violate the Sherman Act. Whether an agreement satisfies the rule of reason depends upon "the facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effects, and the history of the restraint and the reasons for its adoption." *United States v. Topco Associates, Inc.*, 405 U.S. 596, 607, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972). But there are

2. "Schwinn's principal methods of selling its bicycles are as follows: (1) sales to distributors, primarily cycle distributors, B. F. Goodrich and hardware jobbers; (2) sales to retailers by means of consignment or agency arrangements with distributors; and (3) sales to retailers under the so-called Schwinn Plan which involves direct shipment by Schwinn to the retailer with Schwinn invoicing the dealers, extending credit, and paying a commission to the distributor taking the order." *Schwinn*, 388 U.S. at 370, 87 S.Ct. at 1861.

3. First Mississippi's trades for delivery convenience have not been included in these calculations for determining what percentage of urea sold by First Mississippi had been purchased by First Mississippi. Such trades, so long as it cannot be disputed that they are merely for delivery convenience of the manufacturers involved, should not be considered in determining whether a manufacturer is engaging in the business of trading in the commodity.

certain agreements "which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Agreements which are *per se* violations of the Sherman Act include agreements tying the sale of an unpatented article to the sale of a patented article (*Mercoid Corp. v. Minneapolis-Honeywell Regulator Co.*, 320 U.S. 680, 64 S.Ct. 278, 88 L.Ed. 396 (1944)), group boycotts (*Fashion Originators' Guild of America v. Federal Trade Commission*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941)), horizontal price-fixing agreements (*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940)), and vertical price-fixing agreements (*United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960)).

Of relevance to this case, horizontal market-dividing agreements are *per se* violations of the Sherman Act. *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951). But the rule of reason is applied to vertical market-dividing agreements. *Sylvania, supra.* The issue in this case is whether the market-dividing agreement between First Mississippi and Abadir is subject to rule of reason or *per se* treatment.

### B

In the application of a recognized *per se* test, the Supreme Court has warned, "Literalness is overly simplistic and often overbroad."[4] *Broadcast Music, Inc. v. Columbia Broadcasting Systems, Inc.*, 441 U.S. 1, 9, 99 S.Ct. 1551, 1557, 60 L.Ed.2d 1 (1979). And this Court has previously warned that "courts must be careful not to extend the *per se* treatment to a type of restraint literally falling within a *per se* category where the rationale of the generalization is not applicable." *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351 (5th Cir. 1980).

Neither should literalness stand in the way of applying a *per se* rule where the rationale for the *per se* rule applies. For example, competitors are not allowed to make an otherwise horizontal agreement vertical by merely setting up a licensing corporation to "impose" market-dividing agreements on its licensee-stockholders. "We seek the central substance of the situation, not its periphery; and in this pursuit, we are moved by the identity of the persons who act, rather than the label of their hats." *United States v. Sealy, Inc.*, 388 U.S. 350, 353, 87 S.Ct. 1847, 1850, 18 L.Ed.2d 1238 (1967).

The rationale for each *per se* rule is an economic analysis of the agreement, an analysis of the potential economic advantages which might motivate the parties to a particular type of agreement. A *per se* rule is applicable to a particular case if and only if the economic analysis which justifies the rule applies to the particular case. The *per se* horizontal market-distribution rule would be applicable to the agreement between First Mississippi and Abadir if and only if the economic analysis justifying the *per se* rule applied to the relationship between First Mississippi and Abadir. Because the potential economic advantages which might have motivated First Mississippi and Abadir are those characteristic of a vertical rather than a horizontal market-distributing agreement, the *per se* horizontal rule does not apply.

### C

While horizontal market-distributing agreements have no significant potential advantages to the participants other than a reduction in competition, vertical market-distributing agreements do have significant potential economic advantages which are legitimate. The distributor or distributors on whom such agreements are imposed are

---

4. This warning does not imply that the Supreme Court is backing off from established *per se* rules. *See Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980).

only benefitted by a reduction in competition.[5] But the supplier imposing such agreements has several potential economic advantages which are legitimate: attracting competent and aggressive retailers, inducing retailers to engage in promotional activities, market-distribution efficiency, and maintaining control over the safety and quality of the product. *Sylvania, supra.* Furthermore, unless some legitimate advantage is truly necessary, a supplier will not have any interest in imposing such an agreement on its distributors. A supplier will normally prefer stiff competition among its distributors. This keeps the distributors' selling prices as low as possible, thereby maximizing the manufacturers sales. *Id., Red Diamond, supra.*

A particular market-distributing agreement is treated as a vertical agreement if the party imposing the agreement has the potential economic advantages typically available to a supplier in a vertical market-distributing agreement. If these potential economic advantages are absent, then the agreement is horizontal.

Thus, it is not decisive whether the party imposing the restriction is a manufacturer. A market-dividing agreement between manufacturers lacks legitimate potential economic advantages, and would be subject to the *per se* horizontal rule as readily as a horizontal agreement between distributors.[6] But a market-dividing agreement between non-manufacturers is vertical if the party imposing the agreement has the potential economic advantages typical of the supplier in a vertical market-distributing agreement.

The potential economic advantages present for First Mississippi when it imposed a market-distribution agreement on Abadir were the advantages typical of a supplier. Because First Mississippi had Triad as a captive source, and because First Mississippi was liable for a fixed percentage of Triad's costs, First Mississippi's interests are indistinguishable from the ordinary interests of a manufacturer. It has already been noted that antitrust law is concerned not with superficial technical appearances, but with practical economic substance. *United States v. Sealy, supra.*

Not all of the legitimate potential economic advantages noted in *Sylvania* apply with the same force to this case. First Mississippi may have less interest in encouraging promotional activity because there is no brand identification of urea. And those normal market factors encouraging a supplier to let its distributors compete are less effective to the extent that First Mississippi also competes as a distributor. But both of these factors were present in *Red Diamond.* The agreement is nonetheless treated as vertical.

Furthermore, First Mississippi has a potential economic advantage in imposing territorial restraints which is peculiar to an industry manufacturing agricultural products. The demand for such products is seasonal. By requiring distributors to sell exclusively in various parts of the world, First Mississippi could provide itself with a year-round market and avoid both a seasonal production schedule and stockpiling problems. Pursuing production efficiency is wholly consistent with the purposes of the Sherman Act.

A special problem is presented by First Mississippi's purchase, from another manufacturer, of twenty percent of the urea which First Mississippi sold in 1973. That purchase clearly impacts on First Mississippi's claim that it stood in a position upstream from Abadir who also bought (or was in a position to buy) urea from other manufacturers. But that purchase is insufficient to require that the agreement be-

---

**5.** Thus, vertical market-distributing agreements must truly be imposed by a supplier, in fact. Market-distributing agreements which are initiated by distributors are horizontal, even if the supplier is nominally a party to the contract. *United States v. Sealy, Inc., supra.*

**6.** For this reason, this Court's pre-*Sylvania* holding in *Hobart Brothers Co. v. Malcolm T. Gilliland, Inc.*, 471 F.2d 894 (5th Cir. 1973), may remain unchanged by *Sylvania.* The market-distributing agreement imposed in *Hobart* was imposed by one manufacturer against a competing manufacturer.

tween First Mississippi and Abadir be treated as horizontal. There may be a limit to the amount of a homogeneous product a supplier can purchase from a market in which the supplier competes with its distributors, but First Mississippi has not exceeded that limit. The potential economic advantages typical of a supplier in a vertical market-distribution agreement are present for First Mississippi in its agreement with Abadir. First Mississippi has solidified its vertical status by treating the open-market purchase in a manner typical of a supplier or a manufacturer. First Mississippi purchased the urea to be delivered in equal monthly installments. And First Mississippi accepted delivery of the urea in equal monthly installments. First Mississippi represents that the purchase was made to cover anticipated production difficulties. The purchase was conducted in a manner consistent with that representation. First Mississippi behaved like a manufacturer hedging against anticipated temporary excesses of sales over production.

Notwithstanding the noted differences, the potential economic advantages noted in *Sylvania* are present in this case. And notwithstanding the noted differences, Abadir was an agent of First Mississippi just as was the plaintiff in *Red Diamond*. The agreement between First Mississippi and Abadir must be considered vertical. To hold otherwise would require expansion of the horizontal *per se* rule.

### D

And expansion of the horizontal *per se* rule to include this case cannot be justified. To do so would require expanding the *per se* rule to include manufacturers who compete with their distributors by both distributing some of the manufacturers' own goods and purchasing some of the manufacturers' supplies from other manufacturers. This case does not justify such an expansion of the *per se* rule.

*Per se* rules should be applied only to those practices which are plainly anticompetitive and without any redeeming virtue. *Northern Pacific Ry. Co. v. United States, supra.*

A practice is "plainly anticompetitive" and lacking in "any redeeming virtue" under the Sherman Act, therefore, when it can further none of the Act's goals—when it operates to deny to consumers the opportunity to choose among alternative offers without offering the possibility of any joint, efficiency-producing economic activities. *United States v. Realty Multi-List, Inc.,* 629 F.2d 1351 (5th Cir. 1980).

Expansion of the *per se* rule is approached with great caution. "[D]eparture from the rule-of-reason standard must be based upon demonstrable economic effect rather than—as in *Schwinn*—upon formalistic line drawing." *Sylvania, supra,* 433 U.S. at 58–59, 97 S.Ct. at 2562. "It is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act. *United States v. Topco Associates, Inc.,* 405 U.S. 596, 607, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972). "The usual assumption is that a *per se* rule would grow out of a history of rule of reason cases all arriving at the same verdict." *Northwest Power Products, Inc. v. Omark Industries,* 576 F.2d 83, 88 (5th Cir. 1978). "When the Courts are uncertain of the competitive significance of a particular type of restraining, they decline to apply the *per se* label." *United States v. Realty Multi-List, Inc., supra.* With these cautions in mind, it is abundantly clear that the market-distributing agreement imposed by First Mississippi on Abadir should not be ruled within the *per se* rule applicable to horizontal market-distributing agreements. There is an insufficient history of rule of reason cases upon which to base an expansion of that *per se* rule to include all suppliers who also compete with their distributors by both distributing some of their own product and purchasing from another supplier some of the product sold. If economic analysis of this case indicates anything, it indicates that agreements of this type have potential legitimate economic advantages, indicating that the rule of reason should be applicable rather than a *per se* rule.

The market-dividing agreement imposed by First Mississippi on Abadir violated Section 1 of the Sherman Act if and only if that agreement violated the rule of reason test applicable to vertical market-dividing agreements.[7]

The parties having stipulated that this case should not be remanded for a new trial under the rule of reason (See transcript of trial at pages 301–02, 309–11, 327, and 458), the judgment on the anti-trust claim is REVERSED.

It is not necessary to address the issue of whether the international nature of the market division would render this a rule of reason case if it were otherwise a horizontal *per se* case. Nothing in this opinion should be read as addressing that issue.

---

7.  Abadir has also argued that there was a market-dividing agreement between First Mississippi and Transamonia, a trader like Abadir. Because Transamonia stood in the same position as Abadir, Transamonia's agreement is subject to the same rule of reason test as Abadir's agreement.