GENERAL AVIATION, INC., a
Michigan corporation,
Plaintiff,

v.

The GARRETT CORPORATION, a California corporation, and The Cessna Aircraft Company, a Kansas corporation, Defendants.

No. G87–657–CA5.

United States District Court,
W.D. Michigan, S.D.

March 22, 1990.

Michael E. Cavanaugh, Lansing, Mich., for plaintiff.

Stephen C. Bransdorfer and J. Terrence Dillon, Grand Rapids, Mich., for defendants.

## OPINION ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

MILES, Senior District Judge.

Now before the Court are the motions of the defendants, The Garrett Corporation and The Cessna Aircraft Company, for summary judgment on plaintiff General Aviation, Inc.'s three-count amended complaint. This action asserts violations of Section 1 of the Sherman Act, 15 U.S.C. Section 1, and the Michigan Antitrust Reform Act, Mich.Comp.Laws Ann. section 445.772, against both defendants. In addition, the plaintiff asserts a tortious interference claim (labelled "loss of financial expectancy" in the first amended complaint) against Cessna.

## FACTUAL BACKGROUND

The Garrett Corporation ("Garrett") is a manufacturer of turboprop and turbofan (jet) engines. Garrett sells these engines to airplane manufacturers, including The Cessna Aircraft Company ("Cessna"). More specifically, Garrett supplied Cessna with an engine known as a "TPE 331–8," which Cessna installed in its "Conquest II," a small turboprop airplane.

Garrett also manufactures replacement parts for its engines. These parts reach consumers through a number of sources. First, Garrett sells the parts directly to consumers at "list price" through its six company-owned service centers in the United States. Garrett also sells TPE 331–8 replacement parts to Cessna at a deep discount, pursuant to a non-exclusive 1977 agreement between the two entities. (Cessna, in turn, sells the parts to Cessna Conquest II dealers at a price still less than Garrett's list price.) In addition, Garrett sells the parts at a discount to independently owned fixed base operators ("FBO's") which Garrett has authorized to perform maintenance and service on its engines ("service centers"). Finally, Garrett sells parts to independent FBO's (not authorized as service centers) at list price.[1]

General Aviation, Inc. ("General") is an FBO headquartered in Lansing, Michigan which services, charters, and sells airplanes. General was a Cessna Conquest dealer from 1977 until 1984, when Cessna refused to renew its franchise.[2] This relationship between Cessna and General, while it lasted, was non-exclusive. As a Cessna Conquest dealer, General could acquire Garrett replacement parts either from Garrett itself at list price, or from Cessna at a lesser price.

From approximately 1980 until 1984, General sought to become a Garrett service center. Becoming a service center would have authorized General to perform certain service functions on TPE 331–8 engines, and would have rendered General eligible for a discount on TPE 331–8 parts pur-

---

1. Used Garrett parts are also available to consumers through parts refurbishers.

2. General brought a previous action against Cessna in this district, No. G85–890–CA5. The Honorable Robert Holmes Bell granted summary judgment to Cessna in that action on December 16, 1988. Cessna advised the court at oral argument on the present motions that an appeal of Judge Bell's order is pending.

chased directly from Garrett.[3] General was qualified to become a service center. However, upon deciding that it needed a TPE–331–8 service center in western Michigan, Garrett appointed Kal Aero, a Kalamazoo, Michigan FBO which was not a dealer for any airplane manufacturer.[4]

General alleges that it did not receive the service center appointment because Garrett had earlier agreed with Cessna not to appoint Cessna dealers as service centers without Cessna's approval. According to General, this informal agreement lasted from 1981 through the "spring or summer of 1984." Also, according to General, the agreement was made upon the insistence of Cessna, which became concerned that its dealers would no longer purchase TPE 331–8 replacement parts from Cessna, but would buy them from Garrett at the discounted prices which it offered its service centers. Cessna, fearful of losing these revenues, and Garrett, fearful of losing a major engine customer, allegedly struck the subject agreement, which resulted in General's nonappointment as a service center.

## STANDARD FOR DECISION

■ Under Fed.R.Civ.P. 56(c), a motion for summary judgment is proper only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The party seeking summary judgment bears the initial burden of identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). When a motion for summary judgment is made and properly supported, the opposing party

must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Although use of summary procedures is certainly not prohibited in antitrust cases, summary judgment motions have traditionally been disfavored in such litigation. *Bender v. Southland Corp.,* 749 F.2d 1205, 1210 (6th Cir.1984); *Smith v. Northern Michigan Hospitals, Inc.,* 703 F.2d 942, 947 (6th Cir.1983). As the Supreme Court has stated,

> Summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot.

*Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). Accordingly, this court must strictly apply the general rule as stated in the paragraph above, and require a *conclusive* showing that no genuine issue of material fact remains to be tried. *Bender,* 749 F.2d at 1210. The evidence must be viewed in a light most favorable to the nonmoving party. *Id.*

## DISCUSSION

### COUNT I—FEDERAL ANTITRUST CLAIM

#### 15 U.S.C. SECTION 1

General claims that the alleged agreement between Garrett and Cessna enabled them to "divide the market" for the sale of TPE 331 engine replacement parts and components, allocating to Cessna all sales to Cessna dealers and resulting in "artificially inflated prices" to Cessna dealers.

Section 1 of the Sherman Act provides that "[e]very contract, combination ... or conspiracy, in restraint of trade or com-

---

**3.** As a Cessna Conquest dealer, General was already authorized to perform some services on TPE 331 engines. However, without service center status, any parts which General purchased directly from Garrett would be at list price.

**4.** Other Cessna dealers also sought Garrett service center appointments during the same time frame that General did. None were appointed by Garrett from 1981 to 1984.

merce among the several States ... is declared to be illegal." To establish a Section 1 claim, a plaintiff must prove the following essential elements:

(1) That the defendants entered into a contract, combination, or conspiracy;

(2) That this contract, combination, or conspiracy affected interstate commerce; and

(3) That this contract, combination, or conspiracy unreasonably restrained such commerce.

*White & White, Inc. v. American Hospital Supply Corp.*, 723 F.2d 495, 504 (6th Cir. 1983); *Continental Cablevision of Ohio, Inc. v. American Electric Power Co.*, 715 F.2d 1115, 1118 (6th Cir.1983).

Garrett has not contested, for the purposes of this motion only, that it had an "informal agreement" with Cessna not to appoint Cessna dealers as Garrett service centers without Cessna's approval. Cessna disputes the existence of such an agreement; however, Cessna has not identified any factual materials in support of its motion which tend to negate the existence of the agreement. In contrast, General has identified a substantial amount of circumstantial evidence from which a jury could reasonably conclude that Garrett did not act independently in imposing its restriction on the appointment of service centers. *See* Plaintiff's Brief in Opposition to Motion for Summary Judgment at pp. 12–24. However, even assuming that General can establish the existence of the alleged agreement, that fact alone does not conclude the Court's analysis.

█ In determining whether a restraint on trade unreasonably restricts competition, courts have traditionally used two different methods of analysis—the *"per se* rule" and the "rule of reason." *United States v. Cooperative Theatres of Ohio, Inc.*, 845 F.2d 1367, 1370 (6th Cir.1988):

There are, thus, two complementary categories of antitrust analysis. In the first category are agreements whose nature and necessary effect are so plainly anti-

competitive that no elaborate study of the industry is needed to establish their illegality—they are 'illegal *per se.*' In the second category are agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed.

(quoting *National Society of Professional Engineers v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978)). There is a general presumption in favor of applying the rule of reason analysis except in those cases where the alleged agreement is " 'manifestly anticompetitive.' " *Id.* (quoting *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49–50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). For example, practices generally found to be illegal *per se* are price-fixing agreements, horizontal market allocations, and tying arrangements. *Davis–Watkins Co. v. Service Merchandise*, 686 F.2d 1190, 1196 (6th Cir.1982), *cert. denied,* 466 U.S. 931, 104 S.Ct. 1718, 80 L.Ed.2d 190 (1984).

█ In their motions for summary judgment, Garrett and Cessna argue that the alleged agreement is a vertical nonprice restraint subject to rule of reason analysis under *GTE Sylvania*, 433 U.S. at 58–59, 97 S.Ct. at 2561–62; they argue that the restraint is not a *per se* violation of the Sherman Act. The defendants are correct that the alleged restraint contains no price agreement, and is therefore, obviously, a nonprice restraint. *See Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 735–36, 108 S.Ct. 1515, 1525–26, 99 L.Ed.2d 808 (1988) (vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels). Indeed, General, in its complaint, contends only that the alleged agreement enabled Garrett and Cessna to divide the market for TPE 331 parts and *"resulted in* artificially inflated prices to Cessna dealers." [5] General does not contend that Garrett and Cessna jointly set prices.

**5.** General's own expert has admitted that alleged agreement between Garrett and Cessna was not a price-fixing agreement. He stated that the

agreement "allow[ed] Cessna to price *independently....* " Affidavit of Peter Max, Paragraph 23 (emphasis added).

The more complex question to be resolved is whether the alleged agreement is vertical or horizontal. The Sixth Circuit has distinguished these two types of conspiracies:

> Horizontal conspiracies involve agreements among competitors at the same level of competition to restrain trade, such as agreements among manufacturers to fix prices for a given product and geographic market, or among distributors to fix prices for a given market. Vertical conspiracies, on the other hand, involve agreements between competitors at different levels of competition to restrain trade, such as agreements between a manufacturer and its distributors to exclude another distributor from a given product and geographic market.

*Crane & Shovel Sales Corp. v. Bucyrus–Erie Co.*, 854 F.2d 802, 805 (6th Cir.1988). It is undisputed that Garrett manufactures and sells aircraft engines to a variety of aircraft manufacturers including Cessna. Garrett also manufactures replacement parts for its engines, and sells these parts to aircraft manufacturers, FBO's (including some Cessna dealers), and directly to consumers. Because Garrett sells replacement parts to Cessna dealers, as does its customer Cessna, Garrett operates at both the manufacturing level and at the distributorship level. Thus, this case involves a "dual distributorship." [6] However, it also involves a relationship between Garrett and Cessna which is neither purely vertical nor purely horizontal; Garrett is a supplier of Cessna, but the two are also competitors in the market for the sale of replacement parts and components.

General argues that summary judgment may not be granted because a genuine issue of material fact remains as to whether the alleged agreement is a horizontal market allocation between competitors (thus subject to the *per se* rule) or a vertical restraint (thus subject to rule of reason analysis). General alleges that the focus of the Court's inquiry must be must be upon the purpose and effect of the restraint. However, the Supreme Court has recently stated that

> ... a restraint is horizontal not because it has horizontal effects, but because it is the product of a horizontal agreement.

*Business Electronics*, 485 U.S. at 730 n. 4, 108 S.Ct. at 1522 n. 4. Garrett and Cessna have a supplier/customer relationship, and the restriction imposed by Garrett was a vertical restriction imposed upon its independent service center network. The mere fact that Garrett and Cessna also happen to compete in the sale of TPE 331 replacement parts does not rebut the presumption that a rule of reason analysis is to be applied.

Given the dual distributorship situation present in this case, this Court is of the belief that application of a *per se* analysis would be inappropriate as a matter of law. Dual distributorship situations have, by and large since the Supreme Court's ruling in *GTE Sylvania*, been analyzed by courts under the rule of reason. *See Dimidowich v. Bell & Howell*, 803 F.2d 1473 (9th Cir. 1986), *modified*, 810 F.2d 1517 (1987) ("hybrid" arrangement, composed of both a dual distributorship and horizontal competitor relationship, should be analyzed under the rule of reason); *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705 (11th Cir.1984) (applying rule of reason analysis to dual distributorship, on motion for summary judgment); *Krehl v. Baskin–Robbins Ice Cream Co.*, 664 F.2d 1348 (9th Cir.1982) (dual distribution system analyzed under rule of reason standard, on Rule 41(b) motion to dismiss); *Copy–Data Systems, Inc. v. Toshiba America, Inc.*, 663 F.2d 405 (2d Cir.1981), *cert. denied*, 474 U.S. 825, 106 S.Ct. 80, 88 L.Ed.2d 66 (1985) (district court's application of *per se* rule to dual distributor restraints reversed); *Abadir & Co. v. First Mississippi Corp.*, 651 F.2d 422 (5th Cir.1981) (reversing application of *per se* rule to vertical market-dividing agreement, where defendant, who competed with its distributor, attempted to impose territorial restriction on distributor);

---

**6.** *See Davis–Watkins*, 686 F.2d at 1201 n. 14: "A dual distributorship involves a business structure in which one party operates a branch of dealership on the same market level as one or more of its customers."

*Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001 (5th Cir.1981), *cert. denied*, 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981) (applying rule of reason to alleged agreement between manufacturer and distributors to maintain territorial and customer restrictions, even though manufacturer also sold products directly to users); *Manufacturers Supply Co. v. Minnesota Mining and Mfg. Co.*, 688 F.Supp. 303 (W.D.Mich.1988) (3M distributed its products through combination of its own salespeople and independent distributors; the court analyzed a restraint prohibiting distributors from reselling products to certain customers or outside certain geographical territories as a vertical restraint, on motion to dismiss). The Sixth Circuit's recent opinion in *International Logistics Group, Ltd. v. Chrysler Corp.*, 884 F.2d 904 (6th Cir.1989) suggests that it believes this to be the correct approach. In that case, the Court of Appeals refused to apply a *per se* analysis to an alleged restraint imposed in a dual distribution context. Chrysler, a supplier and distributor of its own replacement parts to domestic dealers, together with one of its divisions which marketed Chrysler Power Master engines internationally at reduced prices, cancelled all Power Master orders from corporations which refused to desist from reselling the cheaper export units to Chrysler's domestic dealers. The Sixth Circuit found that such action did not even amount to a conspiracy, and certainly could not be characterized as a *per se* violation of the Sherman Act:

> Although some minimal horizontal competitive effects may have resulted, the marketing policies concerning the Power Master engine were not directed toward or designed to impose restraints upon

parties at the same competitive level even though Chrysler, the manufacturer, was also a distributor.

*Id.* at 906.

Furthermore, the mere fact that Cessna—the distributor—may have initiated the agreement does not render the agreement horizontal, nor does it justify application of the *per se* approach. In *Business Electronics*, the respondent Sharp eliminated the petitioner Business Electronics as a retailer of its products upon the insistence of a second retailer, who complained about Business' price-cutting. 485 U.S. at 721, 108 S.Ct. at 1518. Still, the Supreme Court held that such a vertical nonprice restraint was to be analyzed under the rule of reason. Indeed, the fact that Cessna initiated and demanded the agreement militates against application of the *per se* rule, particularly inasmuch as General itself concedes that the agreement was contrary to Garrett's own economic interests and marketing strategy.[7] In *Balmoral Cinema, Inc. v. Allied Artists Pictures Corp.*, 885 F.2d 313 (6th Cir.1989), the plaintiff-film exhibitor alleged that a film distributor's participation in a "split" agreement with exhibitors constituted a "group boycott" subject to *per se* liability. A "split" arrangement is one in which two or more distributors in a given market agree not to compete against each other in the licensing of films from distributors. The Sixth Circuit declined to apply a *per se* rule:

> ... we are hard pressed to apply a *per se* standard to an alleged conspiracy which may be of little or no benefit to those accused of conspiring—namely the defendant distributors. Decreased competition in bidding among exhibitors as pur-

---

**7.** General's admission that the alleged agreement was contrary to Garrett's interests is supported by the conclusions of the defendants' expert:

> Garrett's incentive is to keep distributor margins as small as possible, consistent with its need to maintain viable, efficient distributors. To the extent that Garrett's actions increase distributor margins, the price Garrett can charge for its parts at wholesale is diminished. *Artificially* higher distributor margins— margins raised without some compensating efficiency benefits that increase Garrett

sales—are thus directly contrary to Garrett's interest. Hence the complaint fails a basic test for antitrust matters: 'If the factual context renders respondents' claim implausible— if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary.'

Affidavit of Howard Marvel, Sept. 22, 1989, pp. 12–13 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

chasers of film, on the surface at least, would seem to produce lower licensing fees and, therefore, decreased profitability to distributors rather than, as Balmoral alleges, higher prices. Thus we cannot say that the conduct of the distributors in tacitly consenting to split agreements by purchasers of films was *per se* anti-competitive or harmful to consumers.

*Id.* at 317. For the same reasons, this Court is hard pressed to conclude that the alleged agreement between Garrett and Cessna is *per se* anti-competitive.

■ In an attempt to establish that the alleged agreement had anti-competitive effects which would justify application of the *per se* rule, General argues that the agreement "completely eliminated" *intra*brand competition (competition in the sale of *Garrett* parts) because Garrett parts "are not interchangeable with the parts of other engine manufacturers." Plaintiff's Brief at 57–58. General alleges that Cessna and Garrett are the only distributors of new TPE 331–8 parts. General's claim that intrabrand competition was completely eliminated is unsupported by the facts and by the law. First, Garrett has set forth facts, which have not been contested by General, showing that used Garrett parts are available through parts refurbishers. Secondly, General has not identified any "competitors" who have been "eliminated" pursuant

to the agreement.[8] Absent an allegation of anti-competitive purpose or effect at the *inter*brand level, the substitution of one distributor for another does not violate the antitrust laws. *E.g., Crane & Shovel,* 854 F.2d at 810. General has alleged no anti-competitive effects whatsoever at the interbrand level.[9]

The Court is convinced that the *per se* rule can not as a matter of law be applied to the particular restraint alleged in this case. Keeping in mind the Supreme Court's recent reassertion in *Business Electronics* that there is a presumption in favor of the rule of reason standard, that departure from that standard must be justified by "demonstrable economic effect," and that "interbrand competition is the primary concern of the antitrust laws," 485 U.S. at 726, 108 S.Ct. at 1521, this Court is not convinced that the activity of which General complains is the type of "manifestly anticompetitive" arrangement which justifies application of a *per se* analysis:

> We have said that *per se* rules are appropriate only for 'conduct that is manifestly anticompetitive,' ... that is, conduct 'that would always or almost always tend to restrict competition and decrease output[.]' ...
>
> ... In [*GTE Sylvania*], we refused to extend *per se* illegality to vertical non-price restraints, specifically to a manu-

---

8. General's expert states that

The effect of the agreement was to give Cessna all sales of Garrett TPE 331–8 parts to Cessna Conquest dealers. The anticompetitive nature of the agreement was that it eliminated a competitor from the market, protecting Cessna from price competition, allowing Cessna to price independently, and increasing Cessna's control of the market.

Affidavit of Peter Max, October 30, 1989, Paragraph 23. Mr. Max does not say which "competitor" was eliminated, but he appears to be referring to the elimination of Garrett as a competitor of Cessna. However, the facts are undisputed that Cessna dealers could continue to purchase TPE 331 replacement parts either from Garrett itself or from Cessna even after the two entities entered into the alleged agreement. Those Cessna dealers not authorized as Garrett service centers would simply have to pay Garrett's list price (which was higher than Cessna's price to its dealers) if they purchased from Garrett.

9. The Sixth Circuit has stated that

... a complaint charging restraint of trade based on a manufacturer's substitution of one distributor for another must allege anticompetitive effect at the interbrand level to survive a Rule 12(b)(6) motion for failure to state a violation of Section 1 of the Sherman Anti-Trust Act.

*Crane & Shovel,* 854 F.2d at 807.

As the defendants' expert points out, the alleged agreement in this case may have even served to increase competition by improving service ability; had General been appointed as a Garrett service center, Cessna Conquest owners would have had only one authorized service option in Michigan—General. The appointment of Kal Aero—which was not affiliated with any aircraft manufacturers—gave Conquest owners an additional authorized option. Marvel Affidavit, page 9.

facturer's termination of one dealer pursuant to an exclusive territory agreement with another. We noted that especially in the vertical restraint context 'departure from the rule-of-reason standard must be based on demonstrable economic effect rather than ... upon formalistic line drawing.' ... Moreover, we observed that a rule of *per se* illegality for vertical nonprice restraints was not needed or effective to protect *intrabrand* competition.

*Business Electronics*, 485 U.S. at 723–25, 108 S.Ct. at 1519–20 (citations omitted).

▮ Ordinarily, upon concluding that this case is not an appropriate one for application of *per se* illegality, this Court would apply a rule of reason analysis to determine whether any genuine issues of material fact remain. However, General has chosen not to pursue its claims under the rule of reason.[10] Indeed, even construing the first amended complaint in a most liberal fashion, the Court cannot conclude that General has pleaded a rule of reason case. In order to show that the alleged restraint is unreasonable, General would be required to establish that the agreement produced anti-competitive effects within the relevant product and geographic markets, that the objects of and conduct pursuant to the agreement were illegal, and that the plaintiff was injured as a proximate result of that conspiracy. *Crane & Shovel*, 854 F.2d at 805; *Davis–Watkins*, 686 F.2d at 1195–96. Cessna argues that General has not pleaded, nor can it prove, that either Cessna or Garrett has sufficient

market power in a relevant market to restrict competition. Market power is " 'normally inferred from the possession of a substantial percentage of the sales in a market carefully defined in terms of both product and geography.' " *Manufacturers Supply*, 688 F.Supp. at 307 (quoting *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 666 (7th Cir.1987)). General has alleged in its complaint only that the agreement between Garrett and Cessna "restrained and eliminated competition in the sale of replacement parts and components for the TPE 331 engine in the United States[.]" First Amended Complaint, Paragraphs 21 and 24. General has produced evidence in response to the defendants' present motions showing that Garrett was the only manufacturer of new TPE 331 parts, that these parts were not interchangeable with parts of other manufacturers, and that Garrett and Cessna were the only source of new replacement parts. However, because General has not set forth any facts suggesting effects on an interbrand market,[11] the Court believes that General has not set forth facts sufficient to preclude a grant of summary judgment in favor of the defendants. Therefore, summary judgment will be granted in their favor as to count I.

## COUNT II—STATE LAW ANTITRUST CLAIM

## MICH.COMP.LAWS ANN. SECTION 445.-772

Count II of the first amended complaint asserts a state law claim against both de-

---

**10.** In its response to Garrett's requests for admissions, General admitted that it is "not pursuing any antitrust claims that will be evaluated under the rule of reason." Plaintiff General Aviation Inc.'s Response to the Garrett Corp.'s Request for Admissions, No. 12. Lest there be any doubt regarding the import of this admission, Garrett has alleged that General has refused to respond to discovery requests relevant to determining alleged harm to competition, which is required to establish liability on a rule of reason claim. Defendant The Garrett Corp.'s Brief in Support of Motion for Summary Judgment at 23.

**11.** Interbrand competition is the "primary concern of antitrust law." *GTE Sylvania*, 433 U.S. at 52, 97 S.Ct. at 2558. Intrabrand competition

is of some concern as well. As one Circuit has stated, inquiries into the scope of competition under section 1 and section 2 of the Sherman Act are not precisely the same; stifling intrabrand competition may violate section 1, while obtaining a "monopoly" over a given brand would clearly not run afoul of section 2. *Columbia Metal Culvert Co., Inc. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d 20, 27 n. 11 (3d Cir.1978), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978). However, General has not set forth facts showing that intrabrand competition was "stifled" in any sense of the word, having presented no evidence that consumers have any fewer sources available for purchase of Garrett replacement parts.

fendants under Mich.Comp.Laws Ann. section 445.772, the Michigan Antitrust Reform Act. This claim mirrors General's Sherman Act claim contained in count I. The wording of Mich.Comp.Laws Ann. section 445.772 is virtually identical to that of section 1 of the Sherman Act, and therefore, federal precedents interpreting the Sherman Act are considered authoritative in Michigan courts.[12] Thus, for the reasons stated above, summary judgment will be granted in favor of the defendants upon this state law claim.[13]

### COUNT III—"LOSS OF FINANCIAL EXPECTANCY"

■ Count III of General's first amended complaint is a state law claim against Cessna labelled "loss of financial expectancy." General alleges that Cessna agreed not to prevent General from affiliating with other equipment manufacturers, but that Cessna nonetheless prevented General from being appointed as a Garrett service center, causing General to lose this "financial expectancy." In its motion for summary judgment, Cessna argues that this claim is barred by the statute of limitations.

In support of its motion for summary judgment, Cessna identifies facts showing that General's request for appointment as a Garrett line service center was denied in March 1984. *See* Deposition of Maynard McAdams, at p. 223 (showing denial prior to March 29, 1984). In response to Cessna's motion, General has not set forth any specific facts which create a genuine factual issue as to the date its claim arose, nor has it set forth any facts which would support the tolling of the limitations period. Thus, any "loss" suffered by Cessna occurred prior to that date, and it therefore follows that General's cause of action accrued no later than March 29, 1984.

General filed its initial complaint in this action on July 24, 1987. This initial complaint did not contain a claim for loss of financial expectancy. The first amended complaint was filed on August 7, 1989.[14] However, even assuming that the addition of Count III relates back to the filing of the initial complaint, General is time-barred from pursuing this particular claim.

The limitations period applicable to General's claim for loss of financial expectancy is the three year limitations period set forth in Mich.Comp.Laws Ann. section 600.5805(8). General's claim is most similar to a claim for tortious interference with prospective economic relations, to which Michigan courts have consistently applied Mich. Comp.Laws Ann. section 600.5805(8).[15] *James v. Logee*, 150 Mich.App. 35, 388 N.W.2d 294, 296 (1986); *Joba Construction Co., Inc. v. Burns and Roe, Inc.*, 121

---

**12.** Mich.Comp.Laws Ann. section 445.772 provides as follows:

> A contract, combination, or conspiracy between 2 or more persons in restraint of, or to monopolize, trade or commerce in a relevant market is unlawful.

This statute is modelled after the Uniform State Antitrust Act. The comment to the Uniform Act section above states that

> The adoption of Sherman Act language establishes its general standards of legality, provides needed flexibility, and makes available to state courts the relevant body of federal precedent.

**13.** The Court notes that Mich.Comp.Laws Ann. section 445.772 did not go into effect until March 29, 1985. General's first amended complaint alleges that the agreement between the defendants continued until "at least the spring/summer of 1984." Therefore, on its face, the first amended complaint does not state a violation of section 445.772.

Even if General had instead stated a claim for violation of the predecessor to section 445.772—

the now-repealed section 445.701—the same analysis would apply and summary judgment in favor of the defendants would be in order. Prior to its repeal, Michigan courts had held that section 445.702 was likewise patterned after the Sherman Act, and that federal court interpretations were persuasive authority as to section 445.701's meaning. *Goldman v. Loubella Extendables*, 91 Mich.App. 212, 219, 283 N.W.2d 695, 699 (1979).

**14.** In its order granting General permission to file the first amended complaint, the Court indicated that Cessna's right to assert a statute of limitations defense would not be prejudiced.

**15.** Mich.Comp.Laws Ann. section 600.5805(8) provides as follows:

> The period of limitations is 3 years after the time of the death or injury *for all other actions to recover damages* for the death of a person, or *for injury to* a person or *property.* (emphasis added).

Mich.App. 615, 329 N.W.2d 760, 766 (1982); *Meyer v. Hubbell,* 117 Mich.App. 699, 324 N.W.2d 139, 144 (1982); *Wilkerson v. Carlo,* 101 Mich.App. 629, 300 N.W.2d 658, 660, *appeal denied,* 411 Mich. 984 (1981).

General attempts to circumvent this three year limitations period by arguing that its claim is governed by the six year period contained in Mich.Comp.Laws Ann. section 600.5813 [16] or, in the alternative, the six year period contained in Mich.Comp. Laws Ann. section 600.5807(8).[17] The Court finds both of these arguments to be without merit. General has cited no case in which Michigan courts have applied Mich.Comp.Laws Ann. section 600.5813 (applicable to "all other personal actions") to a tortious interference claim. As in *Logee,* 388 N.W.2d at 296, the plaintiff in this case has, in its complaint, set forth the essential elements of a tortious interference claim, to which the three year limitations period applies. *Id.* General's attempt to label its claim otherwise is not controlling.[18] *Huhtala v. Travelers Ins. Co.,* 401 Mich. 118, 257 N.W.2d 640, 649 (1977).

Likewise, General's argument that Mich. Comp.Laws Ann. section 600.5807(8) (applicable to actions for breach of contract) applies must also fail. General concedes that it has not stated a claim against Cessna for breach of contract, but instead a claim "for loss of financial expectancy which is based upon a contractual obligation...." (Plaintiff's Brief in Opposition to Motion for Summary Judgment, at 63) The gravamen of an action is determined by reading the claim as a whole. *Adkins v. Annapolis Hospital,* 116 Mich. App. 558, 323 N.W.2d 482, 485 (1982), *aff'd,* 420 Mich. 87, 360 N.W.2d 150 (1984). The gravamen of General's claim as stated in the first amended complaint is Cessna's alleged interference with a potential profitable relationship with Garrett, not breach of contract. Indeed, the unambiguous [19] language of the contract between General and Cessna does not support a conclusion that Cessna assumed a contractual obligation to refrain from interfering with General's carrying of other product lines:

> Subject to the other terms and conditions of and for the term of this Agreement, Cessna appoints Dealer as a dealer for Cessna Conquest aircraft and parts and accessories therefor sold by Cessna granting to Dealer the non-exclusive privilege to sell such products.

(Paragraph A.1, Cessna Conquest Sales and Service Agreement dated October 27, 1983). If Cessna had a duty to refrain from interference, this duty was created by law and not by its contract with General, and the three year limitations period applies. *See Continental Casualty Co. v. Huron Valley Nat'l Bank,* 85 Mich.App. 319, 271 N.W.2d 218, 221 (1978) (where there is no express contract or express promise and defendant's liability is implied by law an action for injury to persons or property is controlled by the three year statute regardless of whether the action is labeled as one in tort or implied contract). Count III is therefore dismissed as being time-barred.

## CONCLUSION

For the reasons stated above, the defendants' motions for summary judgment will be granted. The Court will enter an order in accordance with this opinion.

---

**16.** Mich.Comp.Laws Ann. section 600.5813 provides as follows:

> All other personal actions shall be commenced within the period of 6 years after the claims accrue and not afterwards unless a different period is stated in the statutes.

**17.** Mich.Comp.Laws Ann. section 5807(8) provides as follows:

> The period of limitations is 6 years for all other actions to recover damages or sums due for breach of contract.

**18.** If the label alone were controlling, General would have stated no claim at all; this Court has never heard of a cause of action for "loss of financial expectancy."

**19.** Whether the terms of a contract are ambiguous is a question of law for the court to determine. *Steinmetz Elec. Contractors Ass'n. v. Local Union No. 58,* 517 F.Supp. 428, 432 (E.D. Mich.1981).